UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK                                    **FOR PUBLICATION**

-----------------------------------------------------------------
In re

Performance Transportation Services, Inc., *et al*              Case No. 07-4746 K

                                  Debtor
-----------------------------------------------------------------
Mark S. Wallach, Esq., Chapter 7 Trustee of
Performance Transportation Services, Inc., et al.

                                  Plaintiff

              -vs-                                              AP No. 09-1190 K

Ford Motor Company

                                  Defendant
-----------------------------------------------------------------
Mark S. Wallach, Esq., Chapter 7 Trustee of
Performance Transportation Services, Inc., et al.

                                  Plaintiff
              -vs-                                              AP No. 09-1244 K

Ford Motor Company

                                  Defendant
-----------------------------------------------------------------

Janet G. Burhyte, Esq.
Gross, Shuman, Brizdle & Gilfillan, P.C.
465 Main Street, Suite 600
Buffalo, NY  14203

Attorney for Plaintiff

Marc N. Swanson, Esq.
Ronald A. Spinner, Esq.
Miller Canfield Paddock & Stone, PLC
150 West Jefferson Avenue, Suite 2500
Detroit, MI 48226

Attorneys for Ford Motor Company

Kevin Tompsett, Esq.
Harris Beach PLLC
99 Garnsey Road
Pittsford, NY 14534

Attorney for Ford Motor Company

OPINION AND ORDER

REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The matter at the Bar seems to be one of first impression.

In 1938 and again in 1978 Congress tried to put an end to decades of judicial efforts to reconcile "setoffs" with "preferential transfers." 11 U.S.C. § 553 was the legislative result. ". . . [T]his title does not affect the right of a creditor to offset." It was no longer necessary to shoehorn setoffs into preference analysis. It works very well. However, sophisticated parties sometimes do not use setoffs when, perhaps, they should.

For some reason not known to the Court,[1] North American manufacturers of automobiles and the companies that haul those automobiles to distribution centers and dealers choose not to avail themselves of the sanctuary that § 553 provides. Instead, as described in an earlier decision of this Court (475 B.R. 5 (Bankr. W.D.N.Y. 2012)), the manufacturers and the

---

[1] Perhaps it is more efficient to keep the "accounts payable" department separate from the "accounts receivable" department in very large enterprises.

haulers maintain what might be called "separate ledgers": One specifying what the manufacturer owes to the hauler for hauling services, and the other specifying what the hauler owes to the manufacturer for damages suffered by the vehicles while in the custody of the hauler.

Almost universally in the world of smaller businesses this would be dealt with by setoffs,[2] but not in this particular industry. Original Equipment Manufacturers ("OEMs") pay for hauling services without regard to what an individual hauler might owe to the OEM for damaged vehicles, and the hauler pays the OEM for damages to vehicles, regardless of what the OEM owes to the hauler for hauling services.

Now that the affiliated companies[3] that once constituted the second largest hauler of new cars in North America have ended up in Chapter 7 bankruptcy, Ford Motor Company argues that over $300,000 that was paid to it by two of these consolidated debtors for vehicle damage are not subject to preference attack because of over $14,000,000 of new hauling orders placed with those debtors by Ford during the preference period. To Ford, those new orders must have generated "new value" sufficient to offset the otherwise-preferential payments. It posits that the new orders that it placed were essential to the Debtor, and kept it afloat. There is a strong evidentiary basis for that statement because this Court approved continuation of the

---

[2]Setoffs are not always exercised on a transaction-by-transaction basis, however. Reciprocal open accounts are common. Regardless of whether (or when, or how often) such accounts are brought to zero balances by an <u>exercise</u> of setoff, the <u>right</u> of setoff is respected in bankruptcy by virtue of § 553.

[3]Although the Court might mix the terms "debtor," "those debtors," etc., in this Decision, the parties and Court have been very careful to distinguish among the many substantively consolidated debtors. For the purposes of this Decision it is understood that the two Debtors at issue are Hadley and E & L. (There is at least one other Adversary Proceeding against Ford Motor Company in which payments that are not implicated today were made to Ford by an affiliated debtor. Those will be addressed in another decision.)

"Damage Program" in "first day" orders based upon the affidavit of a principal of the Debtors, John Stalker, who emphasized the need to continue the program in order to remain competitive in the industry. (These were <u>un</u>consolidated Chapter <u>11</u> cases at that time.)

Ford agrees that it has no means of <u>quantifying</u> the "new value" bestowed upon the Debtors while the Debtors were paying vehicle damage obligations to Ford, but explain that whether one measures "new value" by cash flow, profit margin, maintaining a valuable relationship, or otherwise, its millions of dollars of new orders placed with the Debtor simply "had" to have provided "new value" to the Debtor in an amount in excess of the challenged transfers. (It seeks "burden-shifting" as to quantification of the "new value.")

In economic terms, the Court does not dispute that conclusion. In legal terms, however, the Court finds that Ford wishes to place a square peg in a round hole.

DISCUSSION

To begin the analysis, consider other cases that either were decided by this Court, or otherwise came to this writer's attention, in which parties chose not to take advantage of statutes or regulations that clearly would have protected their interests, but then argued that their interests should be protected by some equitable doctrine or by a convoluted construction of a different statute or regulation. On the consumer side, cases range from the non-debtor husband (or ex-husband) who claimed that the Harley Davidson motorcycle was actually his, despite the fact that it was titled to the debtor-wife "for convenience only" (In re *Wittmeyer*, 311 B.R. 137 (Bankr. W.D.N.Y. 2004)), to the siblings who deeded their deceased parents' home to the brother

who eventually became a debtor here, expecting that their "equitable" ownership shares would be recognized here.  (In re *Lorenzo*, 340 B.R. 450 (Bankr. W.D.N.Y. 2006).)

On the commercial side, cases range from the home builder who did not get a mortgage or file a mechanics lien (In re *Religa,*157 B.R. 54 (Bankr. W.D.N.Y. 1993)) to an equipment lessor who agreed to a capital lease but did not file a UCC statement to perfect a lien on the "leased" property,[4] and on to Industrial Development Agencies[5] and then to highly-sophisticated financial transactions such as "loan participations" in which what this Court thinks of as "loose ends" seem not always to be "tied up" as a matter of law.[6]

---

[4] That was not a published decision. Rather, at a Continuing Legal Education seminar in Rochester, New York in the early 1980s, twenty lawyers from the Office of General Counsel of Xerox Corporation were in attendance.  In those days, Xerox dominated the photocopier market, and the majority of its customers "leased" the copiers on "financing leases" or "capital leases."  Upon learning at the seminar that such leases are treated as secured sales in bankruptcy court and required the filing of a UCC statement if Xerox was to be recognized as a secured creditor, those lawyers turned to their supervisor (who was also in attendance) and asked why Xerox did not regularly perfect UCC filings as part of each capital lease transaction. The supervisor answered somewhat like this: "Our bankruptcy losses are minuscule compared to the administrative costs and filing fees involved in doing UCC perfection for every capital lease that we do."  In other words, it was a sound business model.

[5] Again, this was not a decision of this Court.  See *In re The Hotel Syracuse,* [155 B.R. 824 (Bankr. N.D.N.Y. 1993)].  In that case the tax-driven benefits of IDA funding (the "business model") came into conflict with the legal structure enabling those development projects.

[6] This Court's reservations about that fact were expressed in a sealed decision, but one of this Court's holdings was reversed.  See *In re Adelphia Recovery Trust v. HSBC Bank, et al.*, 634 F.3d 678 (2d Cir. 2011).   In that case this Court expressed concern that both sides were glossing-over an important question of fact - - Did a "junior participation" in certain loans that were secured by the Buffalo Sabres NHL team (and its affiliates) actually ever "ripen" into complete ownership of the loans. It was important because the "senior participants" did not appear here when this Court approved the free-and-clear sale of what had been their collateral. Later they were sued by Adelphia (whose money was used to buy the "junior participation") which asserted that that participation was worth far less than what Adelphia was caused to pay (i.e., fraudulent transfer). The "seniors" argued that they were "innocent absentees" here when the collateral was sold free-and-clear, and that they consequently could not be sued because they could have no recourse to their collateral if the alleged fraudulent transfers were to be set aside.  Despite thousands of documents put in evidence here, not one was offered to demonstrate that the "seniors" were not still "participants" on the day this Court approved the free-and-clear sale.  Hence this Court's finding that their absence was not shown to be "innocent."  As said before, both sides agreed that the junior participation had "ripened" (their word, not mine) into full ownership of the loans. The Second Circuit accepted that characterization without discussion, and reversed this Court's holding.

The point is that often there are ways to lock-up rights by use of a statute.

There also are regulatory safe havens. For example, an Air Canada pilot who was a debtor here was not permitted by this Court to claim an exemption for a six-digit pension fund because Air Canada had not obtained (for its United States-based employees' retirement plans) regulatory approval from the Internal Revenue Service. New York State exemption laws required such regulatory approval. (*In re Ondrey*, 227 B.R. 211 (Bankr. W.D.N.Y 1998)).

Because Ford did not use the safe haven of 11 U.S.C. § 553, it has offered its novel interpretation of "new value" in the "preference" context.

It has never been this writer's view that one loses simply because of the failure to <u>seek</u> the sanctuary of a protective statute. Rather, it has been the much-published view of this and other courts that countless parties who try to avail themselves of protective statutes or regulations <u>fail to do it properly</u>. Seeking is not achieving. By way of analogy, legions of cases have addressed the quality of <u>UCC</u> filings. (They need not be cited here. ) Failure to properly name the borrower may defeat the perfection of the security interest because it may end up in the wrong place in an ambiguous index in state or local records. Many other cases turn on a description of the collateral. A lot of creditors do it right, but many others do it wrong.

Ford accepted various checks from the Debtor in payment for antecedent vehicle damage obligations, thus choosing to receive preferential payments.[7] And if it had used setoff, it

---

[7] One might ask "What's the difference? If what these parties practiced would have had a 'safe haven' in setoffs, then why not a 'safe haven' in the 'new value' defense to a § 547 preference attack?"

might not have fully succeeded because of the "improvement in position" test.  (11 U.S.C. § 553(b) .)

This Court does not unequivocally reject the notion that placing huge orders with the eventual debtor cannot be "new value."  However, the defendant who claims the benefit of the "new value" defense is statutorily burdened with the duty to quantify the "new value," with specificity. [See, 11 U.S.C. § 547(3)]  Ford complains that that quantification is sufficiently unfair as to shift the burden to the Trustee, citing *Bavis v. UAL Corp. (In re Sept. 11 Litig.)* 811 F.Supp. 883, 894 (S.D.N.Y. 2011), *Nat'l Commc'ns. Ass'n, Inc. v. AT&T Corp.*, 238 F.3d 124, 130-31 (2d Cir. 2001).  If § 553 did not exist, the Court might agree with Ford Motor Company.  However, that statute does exist, and exists for a reason.  All other things being equal, no-one may question the "value" of mutual receivables that are <u>unpaid</u>, or their setoff.  Here, however, the Debtor's actual payments for vehicle damages diminished the Debtor's operating funds, and no one knows how that compares with what benefits flowed to the Debtor, if any, from the new orders placed by Ford.

The Court rejects the notion that a multi-million dollar business model that could and should have been addressed as § 553 setoffs are to send a bankruptcy court back to the days

---

The hypothetical answer is that "payment in cash" by the Debtor reduced the Debtor's operating funds.  Big receivables from Ford were certainly a good thing, but did not necessarily improve the Debtor's operating ability.  The payments out to Ford might have been fatal to the Debtor and its other creditors.  Who can know where a balance might tip?  And who can know whether other creditors extended more than they otherwise might have extended had they known that good looking "accounts-receivable" from Ford, and new orders from Ford, were subject to cash outflow to Ford under the "Damage Program."

when setoffs were hard to reconcile with "preference" analysis.[8]

Setting that policy consideration aside, the Court finds that careful examination of the definition of "new value" contained in § 547(a) does not support Ford's argument. As noted in this Court's earlier decision in this Adversary Proceeding (475 B.R. 5 (Bankr. W.D.N.Y. 2012)), the Court asked counsel for Ford what Ford provided that would constitute "new value," and counsel answered "it provided 'money.'" The Court disagrees. Ford provided new purchase orders, not money. Ford obligated itself to pay for services to be rendered in the future by the Debtors, provided that the Debtors actually performed those services. As each new service order was fulfilled by the Debtors, Ford became the contract obligor. Ford became a debtor, not a creditor, and payment by Ford upon each of those work orders simply satisfied Ford's obligations to the Debtors.

It is the Court's view that Ford's satisfaction of its obligations to the Debtors arising out of the completion by the Debtors of each work order cannot fall within the language or intendment of the "new value" definition of "money or monies worth in goods, services, or new credit." The clear implication of that phrase in the context of the purpose of the "new value" defense is that the transferee has taken on a risk when it "gave new value to or for the benefit of the debtor." (§ 547(c)(4).)[9]

---

[8]Hearkening back to the Xerox model described at footnote 4 above, this Court says "Do it! It works well for you in a massive business model. But when your sound business plan bumps against bankruptcy law, you might have to sit down and write a check to the trustee as a cost of doing business that way."

[9]The phrase came from very old origins, - - The Uniform Trust Receipts Act. That led to U.C.C. Article 9-102(57).

The common situation is that the preferential transferee delivered new goods or services <u>on credit</u> after the preferential transfer, or made a <u>loan</u> of money after the preferential transfer. The cases cited by Ford that are uncommon transactions that nonetheless can constitute "new value" all meet that test of "risk taking" by the transferee/defendant. For example, assuming that forbearing from collecting an obligation may constitute "new value," it is clear that the recipient of an otherwise preferential transfer who thereafter forbears from collecting a sum that is due and owing is taking the risk that that obligation will never be paid. (E.g. *Buffalo Auto Glass,* 187 B.R. 451 (Bankr. W.D.N.Y. 1995).) Similarly, to the extent that a recipient of an otherwise preferential transfer who later signs a personal guarantee that enables a debtor to obtain new credit has taken on the risk of being held personally liable on that new debt. (E.g. *In re Kumar Bavishi & Assoc.,* 906 F.2d 942 (3d Cir. 1990).)

Under the business model at issue here, the Court can discern only two ways in which Ford took on any risk, and only one of those involved a potential economic loss to Ford. The first, of course, was the risk that the Debtors would be unable to fulfill a new order (or orders). If non-performance would cause Ford to suffer any economic loss, that would certainly be quantifiable by Ford, and Ford has not offered that argument (and probably cannot, in good faith, make that argument).[10] The second risk that Ford took has more visible economic

---

[10] The Debtor's business was highly competitive. A default upon any of the new orders surely would have been an inconvenience and an annoyance to Ford, but it seems likely to the Court that one of the Debtors' competitors would have jumped at the chance to do the new-car hauling that the Debtor failed to do. This is not to say that all recipients of preferential transfers do not take a great risk in placing a new order thereafter. This writer is reminded of a phone call he received nearly 30 years ago, long before this writer became a judge, in which an attorney-friend wanted to brainstorm a highly unusual matter pending in another District. The debtor-in-possession was a well-established designer, fabricator, and installer of ski lifts. The friend's client was a ski resort that wanted to place a multi-million dollar order for a new lift (or lifts) and was trying to determine the best way to protect itself (to the extent possible) if

consequences. That is the risk that while it continued to do business with the Debtor by placing new orders, the Debtor would fail to pay old obligations for vehicles damaged in the Debtor's possession. That obviously brings the analysis to full circle. Ford has argued (given the fact that all of the damage payments that were made during the preference period were minuscule compared to the new business that Ford ordered from the Debtors) that what it received (the challenged damage payments that were preferential payments) amounted to less than 1.7% of what Ford paid to the Debtors for work that the debtor completed during the preference period. By Ford's own reasoning, then, that risk was of minuscule value <u>to Ford</u>. Moreover, if Ford was placed at any risk at all with regard to the unpaid damage payments it was totally a function of the business decision not to use "setoffs."[11] A self-inflicted wound.

Ford's Summary Judgment motion is denied as to the "new value" defense.

It also argues that the Trustee has failed to raise a disputable issue of material fact for Rule 56 purposes. Having declined to entertain Ford's "new value" defense, and rejecting its "burden-shifting" argument, it is best to restore this Adversary Proceeding to the Calendar for

---

the debtor-in-possession was unable to complete the contract. Our discussion principally surrounded intellectual property (the designs), raw materials, work in process, and the like, given that there seemed to be little that lawyers could do to address the matter of the possible loss of enhanced revenues that the ski resort expected once the lifts were in place, if they were not delivered. Because that debtor was already in Chapter 11, the customer had the benefit of a bankruptcy court to hear its requests for sufficient property interests in the intellectual property, raw materials, work in process, etc., that would permit it to hire another company to pick up where the debtor left off, if the debtor failed. Were the same scenario to be presented in a context involving § 547 (a context in which a customer that received a preferential payment thereafter placed a huge new order that involved a great deal of risk to the customer), there could be merit to the type of argument that Ford is making here. So the Court makes no categorical ruling against such an argument.

[11]It may be important to bear in mind that although this case was filed in 2007, one of the vehicle-damage payments that are challenged accrued in 1995 (or so the Court was told at the latest oral argument). Apparently, Ford was not very worried about payment delays. Perhaps it was also not worried about some degree of non-payment.

Case 1-09-01190-MJK    Doc 89    Filed 02/08/13    Entered 02/08/13 15:46:51    Desc Main
Document    Page 10 of 11

further scheduling.  This matter is so restored for telephonic scheduling conference on **February 26, 2013 at 2:00 p.m.**

        SO ORDERED.

Dated:        Buffalo, New York
                February 8, 2013

                                                s/Michael J. Kaplan
                                                _____
                                                         U.S.B.J.

Case 1-09-01190-MJK    Doc 89    Filed 02/08/13    Entered 02/08/13 15:46:51    Desc Main
Document      Page 11 of 11